**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Nicanor Almeida IRIBE,**
**Defendant–Appellee.**

No. 92–1388.

United States Court of Appeals,
Tenth Circuit.

Dec. 15, 1993.

John M. Hutchins (James R. Allison, Interim U.S. Atty.; Kathleen M. Tafoya, and Guy Till, Asst. U.S. Attys., District of Colorado, with him on the briefs), Asst. U.S. Atty., District of Colorado, for the plaintiff-appellant.

Albert Cohen, Denver, CO, for defendant-appellee.

Before TACHA and EBEL, Circuit Judges, and COOK,* District Judge.

TACHA, Circuit Judge.

The government appeals from a district court order granting the defendant's motion to suppress evidence seized pursuant to a search of his house and garage. 806 F.Supp. 917. We exercise jurisdiction under 18 U.S.C. § 3731 and affirm in part and reverse in part.

## I. Background

In May 1991, a federal warrant was issued for the arrest of the defendant, Nicanor Almeida Iribe. On June 4, 1991, in an attempt to execute the warrant, Detective Dale Wallis of the Denver Police Department was conducting surveillance of a residence at 8371 West 50th Avenue. At approximately 10:00 a.m., Detective Wallis saw Mr. Iribe exit the residence and drive away in a van. Detective Wallis followed Mr. Iribe and radioed Denver Police Detectives Frank Padilla and Bernie Montoya, advising them that Mr. Iribe was traveling eastbound on 50th Avenue. Within minutes, Mr. Iribe was stopped and arrested at 52nd and Stuart Street, approximately forty blocks from the 8371 West 50th Avenue address.

After Mr. Iribe was arrested, he was handcuffed and placed in Detective Padilla's vehicle. Mr. Iribe spoke no English. Detective Padilla advised Mr. Iribe of his *Miranda* rights in Spanish and then asked Mr. Iribe for his permission to return to the residence at 8371 West 50th Avenue. Mr. Iribe responded that he did not live at that address, but that his friend, Juanita Lopez, lived there. Mr. Iribe told Detective Padilla that he did not want to return to 8371 West 50th Avenue, but Detectives Padilla, Montoya and Wallis drove Mr. Iribe back to that address. According to Detective Montoya, the officers returned to 8371 West 50th Avenue at that time because they suspected that Mr. Iribe had conducted a drug transaction there and that he possibly was storing contraband there.

The officers arrived at 8371 West 50th Avenue between 10:20 and 10:30 a.m. Detective Padilla knocked on the door and a young woman answered, identifying herself as Juanita Lopez. Ms. Lopez, like Mr. Iribe, spoke only Spanish. Detective Padilla identified himself as a police officer, told Ms. Lopez that Mr. Iribe was under arrest and asked for her permission to enter the home. According to Detective Padilla, Ms. Lopez "didn't have any problem with it. She said it'd be fine." The three detectives and Mr. Iribe then entered the home. Shortly thereafter, Detective Terry Demmel and Immigration and Naturalization Service Special Agent Carlos Archuletta arrived and also entered the home.

Once inside the home, Detective Padilla asked Ms. Lopez if she lived there and Ms. Lopez stated that she lived there alone. Detective Padilla then asked for Ms. Lopez' permission to search the home. Ms. Lopez signed a consent to search form, which contained a clause discussing the right to refuse consent, that was written in English and read to her in Spanish by Detective Padilla. Detective Padilla testified that he did not have any consent to search forms written in Spanish. Detective Padilla, who speaks both English and Spanish fluently, could not recall whether he spoke with Ms. Lopez in English or Spanish, but he did testify that Ms. Lopez appeared to understand what he said. Detectives Wallis and Montoya recalled the discussion to be in Spanish. Special Agent Archuletta, who spoke Spanish and who was present in part for purposes of assisting the translation, testified that Ms. Lopez agreed to the search and that she signed the consent to search form after Detective Padilla translated it for her from English into Spanish. The record shows that no promises or threats were made to secure Ms. Lopez' consent to search and that the conversation between Detective Padilla and Ms. Lopez was cordial and spoken in low volume.

In the course of the search, the officers found men's clothing and some weapons in a back bedroom. Detective Padilla asked Ms.

* The Honorable H. Dale Cook, Senior District Judge, United States District Court for the North-

ern District of Oklahoma, sitting by designation.

Lopez if someone else lived with her, and she responded that her uncle, Mr. Iribe, lived in the same house. Confronted by Detective Padilla, Mr. Iribe finally admitted that he lived at the residence. Detective Padilla testified that he then read to Mr. Iribe the same consent to search form that Ms. Lopez had signed, translating it from English into Spanish, and that Mr. Iribe consented to the search and signed the form. Mr. Iribe, however, testified that no one asked for his consent to search the house. According to Mr. Iribe, the officers told him to sign a document, and he signed it because he thought he had to since he was under arrest. Mr. Iribe also testified that he did not know what the document was and that the officers did not tell him he could refuse to sign it. The search of the house yielded approximately $49,000 in cash and some weapons.

Following the search of the house, the officers[1] began to search a padlocked garage that was detached from the house and located further back on the same compact residential lot. The search of the garage revealed several handguns, drug distribution paraphernalia and thirteen kilograms of cocaine.

Based on the evidence seized from the house and the garage, a superseding indictment was filed charging Mr. Iribe with several counts of drug and firearms violations. After a motions hearing, the district court concluded that the warrantless searches of Mr. Iribe's house and garage violated his Fourth Amendment rights because no voluntary consent to the searches was given. Accordingly, the court entered an order granting Mr. Iribe's motion to suppress. The government appeals the district court's order, arguing that the evidence seized during the searches of the house and the garage should not have been suppressed.

## II. Discussion

"When we review an order granting a motion to suppress, 'we accept the trial court's factual findings unless clearly erroneous, and we view the evidence in the light most favor-

able to the district court's finding.'" *United States v. Zapata*, 997 F.2d 751, 756 (10th Cir.1993) (quoting *United States v. Swepston*, 987 F.2d 1510, 1513 (10th Cir.1993)). However, "the ultimate determination of Fourth Amendment reasonableness is a conclusion of law which we review de novo." *United States v. Allen*, 986 F.2d 1354, 1356 (10th Cir.1993).

### A. The House Search

■ The government argues that the evidence seized from the house should not have been suppressed because Ms. Lopez voluntarily consented to the search. The Fourth Amendment prohibits "unreasonable searches and seizures." "A warrantless search of a suspect's premises is, per se, unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent." *United States v. Butler*, 966 F.2d 559, 562 (10th Cir.1992) (citations omitted). "Someone other than the subject of the search may give effective consent if she has a sufficient relationship to the property searched." *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir.1990). "The government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched by virtue of her joint access to it, or control for most purposes over it." *Id.* Here, Ms. Lopez clearly had joint access to the house inasmuch as she was living with Mr. Iribe at the 8371 West 50th Avenue address. She therefore was in a position to give effective consent to the search of the house.

■ Mr. Iribe nevertheless contends that the warrantless search of the house was unlawful because he never gave his consent. The police officers, however, did not need Mr. Iribe's consent to search the house. At the time the officers commenced the search of the house, they were not certain that Mr. Iribe was in a position to give effective consent to the search because they were not positive that Mr. Iribe even lived there—he

---

1. Four additional officers arrived at the scene to assist in the search. The record reveals that these officers were not present at the time Ms. Lopez and Mr. Iribe consented to the search. The officers arrived later to assist in carrying out the search.

adamantly denied living at 8371 West 50th Avenue, telling Detective Padilla instead that Ms. Lopez lived at that address. The officers therefore were justified in relying on Ms. Lopez' consent to the search, provided that her consent was voluntarily given.

■ "The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue." *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993). "[T]he government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Id.* The district court found that Ms. Lopez did not voluntarily consent to the search of the house. We must accept that finding unless it is clearly erroneous. *Id.* After carefully reviewing the record, we conclude that the district court's finding is clearly erroneous.

■ The district court's finding that Ms. Lopez did not voluntarily consent to the search of the house appears to be based primarily on two factors purportedly demonstrating her vulnerability to coercion. First, the district court implicitly relied on Ms. Lopez' subjective characteristics, including her attitude toward authority. Citing *United States v. Recalde,* 761 F.2d 1448, 1454 (10th Cir.1985), *United States v. Ward,* 961 F.2d 1526, 1533 (10th Cir.1992), and *United States v. Bloom,* 975 F.2d 1447, 1457 n. 9 (1992), the district court noted that one's national background and unfamiliarity with the law, which sometimes instill in one an acquiescence to police authority, are relevant in determining whether one is more easily intimidated than other persons. In *Zapata,* however, we held that "even assuming some subjective characteristics are relevant to the validity of [one's] consent, we reject the notion that [one's] attitude toward police, from whatever source, can constitute such a relevant subjective characteristic." *Zapata,* 997 F.2d at 759. "[A]n intangible characteristic such as attitude toward authority is inherently unverifiable and unquantifiable." *Id.* This is especially true where, as here, no testimony was presented regarding Ms. Lopez' national background and unfamiliarity with the law

from which one could infer that she felt coerced in consenting to the search. Thus, Ms. Lopez' attitude toward authority should not be given "controlling or even significant weight, as it was in this case by the district court." *Id.* n. 6; *see also United States v. Sanchez–Valderuten,* 11 F.3d 985, 989 (10th Cir.1993) ("*Recalde* ... does not require that defendant's attitude toward authority be given great weight in the totality analysis.").

Second, as evidence of Ms. Lopez' vulnerability to coercion, the district court emphasized the fact that five officers were present at the time Ms. Lopez consented to the search. Although "the presence of more than one officer increases the coerciveness of an encounter," *Ward,* 961 F.2d at 1533, we cannot say that the presence of the five officers in this case alone outweighs the numerous factors indicating that Ms. Lopez voluntarily consented to the search of the house. The officers knocked on the door and Ms. Lopez voluntarily allowed them to enter the house. Although Mr. Iribe was in handcuffs, the record does not reveal that Ms. Lopez felt coerced, frightened or otherwise threatened. The conversation between Detective Padilla and Ms. Lopez regarding her consent to search the house was cordial and spoken in low volume. No promises or threats were made in an attempt to extract her consent.

Furthermore, the evidence indicates that Ms. Lopez' consent was intelligently given. Ms. Lopez signed a consent to search form. The form contained a clause discussing the right to refuse consent. Although the form was written in English, Detective Padilla explained it, along with the right to refuse clause, to Ms. Lopez when he translated the form into Spanish. The fact that Detective Padilla could not recall whether he advised Ms. Lopez in English or Spanish carries little weight. Detectives Wallis and Montoya and Special Agent Archuletta all testified that Detective Padilla spoke to Ms. Lopez in Spanish, and Detectives Padilla and Special Agent Archuletta testified that Ms. Lopez appeared to understand the conversation. In view of the totality of the circumstances, we

conclude that the district court clearly erred in finding that Ms. Lopez did not voluntarily consent to the search of the house.

■ Mr. Iribe nevertheless argues that the evidence seized from the house should be suppressed because any consent to the search is invalidated by the police officers' failure to take him before a federal magistrate "without unnecessary delay" as required by Fed.R.Crim.P. 5(a) and Fed. R.Crim.P. 9(c)(1).[2] We reject this argument. In *United States v. Torres*, 663 F.2d 1019, 1023 (10th Cir.1981), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2237, 72 L.Ed.2d 847 (1982), we stated that Rule 5(a) operates to exclude "*invalidly obtained* confessions and perhaps other evidence" obtained during a period of unnecessary delay in bringing the defendant before a magistrate. Here, however, even assuming that an unnecessary delay occurred, the record does not reveal that the evidence seized from the house was the result of any illegal activity on the part of the officers.[3] Rather, the officers validly sought and received Ms. Lopez' voluntary consent to search the house. *See United States v. Killian*, 639 F.2d 206, 211 (5th Cir. Unit A), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981) (stating that no illegal activity occurred where the arrested person freely consented to a search of his office and attache case).

*B. The Garage Search*

■ In conducting the search of the house, the officers discovered men's clothing and some weapons in a back bedroom. When confronted with this evidence, Mr. Iribe admitted that he lived at 8371 West 50th Avenue. Because this admission was made *before* the officers commenced the search of the garage, Mr. Iribe placed himself in a position to give effective consent to the search of the garage.[4] We must determine then whether Mr. Iribe voluntarily consented to the search of the garage, bearing in mind that the determination is based on the "totality of the circumstances" and that "the government bears the burden of proof on the issue." *Soto*, 988 F.2d at 1557.

■ Mr. Iribe testified that no one asked him for his consent to search the garage and that he did not in fact consent to such a search. Detective Wallis, who does not speak Spanish, testified that Detective Padilla asked questions of Mr. Iribe in Spanish about the garage and that Mr. Iribe orally consented to the search of the garage. Detective Padilla could not recall asking for Mr. Iribe's permission to search the garage, but Special Agent Archuletta testified that he asked for Mr. Iribe's permission to search the garage and that Mr. Iribe granted such permission. The district court found that Mr. Iribe orally consented to the search, but that he was not told he had a right to refuse consent to the search of the garage. Based on the totality of the circumstances, the district court concluded that Mr. Iribe's consent was not voluntarily given, and we must accept that finding unless it is clearly erroneous. *Soto*, 988 F.2d at 1557. After carefully reviewing the record, we cannot say that the district court's finding is clearly erroneous.

In attempting to prove the voluntariness of Mr. Iribe's consent, the government argues that Mr. Iribe was aware of his right to refuse consent to the search of the garage because Detective Padilla advised him of this

---

**2.** Fed.R.Crim.P. 5(a) states that "[a]n officer making an arrest under a warrant issued upon a complaint … shall take the arrested person without unnecessary delay before the nearest available federal magistrate." Fed.R.Crim.P. 9(c)(1) states that "[t]he officer executing the warrant shall bring the arrested person without unnecessary delay before the nearest available federal magistrate."

**3.** The district court found that the officers violated Rules 5(a) and 9(c)(1) because, after arresting Mr. Iribe they returned to 8371 West 50th Avenue, which was forty blocks away, to take advantage of Mr. Iribe's ignorance of his rights. Although the officers returned to 8371 West 50th

Avenue to conduct a search (because they suspected that Mr. Iribe had conducted a drug transaction there and possibly stored contraband there), the record is devoid of any evidence that the officers were attempting to take advantage of Mr. Iribe's ignorance of his rights. To the contrary, Detective Padilla read Mr. Iribe his *Miranda* rights in Spanish after he was arrested and Detective Padilla then sought Ms. Lopez' consent to search the house by translating the consent to search form into Spanish.

**4.** It is undisputed that Ms. Lopez' did not consent to the search of the garage.

right when he asked for Mr. Iribe's permission to search the house. The record, however, only indicates that Detective Padilla translated into Spanish the English consent to search form. Although this form contained a clause discussing the right to refuse consent, the record does not specifically indicate that Detective Padilla advised Mr. Iribe of his right to refuse consent or that Mr. Iribe was aware of his right to refuse consent. In fact, according to Mr. Iribe, he did not know what the form was and the officers did not tell him he could refuse to sign it. He testified that he only signed the consent to search form for the house because the officers told him to sign it, and he thought he had to sign it because he was under arrest. Furthermore, the form signed by Mr. Iribe said nothing about searching the detached, padlocked garage and Mr. Iribe did not sign a separate consent to search form for the garage. In short, based on the totality of the circumstances, we cannot say that the district court's finding—that Mr. Iribe did not voluntarily consent to the search of his garage—is clearly erroneous.

### III. Conclusion

For the foregoing reasons, the decision of the district court granting Mr. Iribe's motion to suppress the evidence seized during the search of his house is REVERSED. The decision granting Mr. Iribe's motion to suppress the evidence seized during the search of his garage is AFFIRMED.